Case number 3130947, consolidated with 3130960, Advocate Health & Hospital Corporation, et al., Sentenced counterclaimants of felons by Hal Morris, and Mercy Crystal Lake Hospital & Medical Center, et al., felons by Stephen Haight, v. Illinois Health Facilities & Services Review Board, et al., Advocate Health & Hospital Corporation, et al., felons by Linda Bachi-Anshaw, and Sentegra Health System, et al., felons by Daniel Mahler. Okay, Mr. Morris, you're going to begin. Yes. You're going to have nine minutes of this. Yes, sir. Yes, sir. Good morning, and may it please the Court and Counsel. Again, I'm Hal Morris on behalf of Advocate Health & Hospitals Corporation and Sherman Hospital and Sherman Hospital and Sherman Health Systems. This is a matter that arises out of, in quite frank terms, a peculiar procedure in front of the Illinois Health Facilities Planning Board. I submit to the Court that the issue before us today is why did the Board, after twice denying the Sentegra application for a project for a new hospital, take the unprecedented step to reconsider its denial based on a single mis-filed document that, in fact, supported their prior denials, yet upon their so-called reconsideration, reversed itself, approved the project without even acknowledging the so-called mis-filed document requiring the reconsideration, much less explaining how the document could have resulted in a change or explaining their change and without allowing written comment at the time that they made that decision. Here, this is really a case about the authority of the Illinois Health Facilities Planning Board. Did it, in fact, operate correctly under its own procedures? Mr. Hayes and I have really divided the argument into two sections. One relates to the specific articulation, or I should say lack of articulation, of a reason for the Board's turnaround. And Mr. Hayes will address that. I, on the other hand, am going to address some of the other issues that really, I think, demand or require scrutiny by this Court in reversal of what this Board did. We start from the proposition that the grant of a permit is not an as-of-right. It's not a right you have. Instead, under the Illinois Health Facilities Planning Act, there has to be an appropriate planning and a following of the rules of the Board that the state statute has created. Here, what's the purpose of that act? The purpose of that act is to have coherent planning for hospitals so as to not have duplication of services, not to have hospitals that are in existence effectively put out of existence through additional over, if you will, supply, and to keep the cost of health care down. How is that working? How is it working? It's working probably better now than it had in the past after the 2009 rewrite of the act because of some of the missteps that this Board took. But how is it working? In this case, it didn't work. How is it working in general? How is it doing on keeping health care costs down? In terms of keeping health care costs down, this is really addressed to the specific facilities. And here, absent this act, we could literally have a hospital in every corner. You cannot just, as you can a convenience store, open up wherever the zoning allows it. You need the approval of this Board. So it's really a utility regulation scheme. In a sense, it is utility regulation. Price protection, competition protection. But for the purpose of protecting the public. Yeah, that's all the preamble to those acts. But here I think it actually is. And the reason I think it actually is, is when you look at the criteria that this Board is to utilize, those criteria are directed specifically at exactly what you're suggesting, protecting the public so we don't have maldistribution of services or we don't have oversupply of services. And that's, in effect, where this misstepped. There's two really irregularities, or I could really say peculiarities, that existed here. There were procedural peculiarities in the way that this Board came to this reverse look itself. Those procedural irregularities included at the time that it came back from the administrative law judge, they did not allow written comment when their rules allow it, and historically they've always allowed it. So before they voted to reconsider and approve the Sintagra project, they didn't allow any more written comment. Secondly, the way they did that is peculiar as well. They adjourned to a lengthy closed session, came out, essentially with no discussion, and voted to approve, changing their mind. Then when advocate and Sherman said, give us your reasons, they came back for another meeting. They allowed written comment at that meeting, but what they did is they violated their rules again. They have a rule against ex parte communications. Not the ex parte communications that we think of in the context of dealing with the court. If you file them too late under their rules, they're considered ex parte under their own regulations. Here, there were two documents filed too late. What did the Board do? They gave one of those documents, the Sintagra document, to the Board for consideration. The other one, which Mercy had filed, they didn't give, violating their rules. And then when they met, then discussed specifically how were they going to articulate, because of the remand from the circuit court, what they did, they once again adjourned to executive session, closed session, they come out without discussion, and they vote again. This lacked what this act in 2009 sought to remedy. Transparency was not here. Openness was not here. And there was nothing that was on the record. It was all done behind a closed door. And that cloak of secrecy, I would suggest to the court, is one of the problems here. The next problem they had was more of a substantive irregularity. The rules of this specific, if you will, criterion that they have, are that you have to meet certain things. Do you have to meet every single criteria? No. But do you have to still be evaluated according to those criteria? Yes. Here, one of the most important criteria, which goes to the need for the hospital, was not met. This was a new hospital. As a new hospital, it had to either provide what are called physician referral letters, which are very clearly described in the regulations to include substantial information, that says that a number of physicians will refer enough cases to the hospital without cannibalizing other facilities to let the hospital meet occupancy levels. Did they do that? No. Instead, Sintegra sought to rely upon so-called rapid population growth. Submit to the court that when they heard this, the board, they didn't follow their rules again. The rules have particular definitions as to what rapid population growth are or population growth within their statutory scheme. Those were not met. Instead, what they did is they took a set of assumptions that the board, at the same meeting that they voted to approve, changed their bed need and said effectively, Sintegra, all of your assumptions, they're wrong, but nonetheless, the board went forward with this regularity. How can they know they're wrong? It's not 2015 yet. I mean, you could say it's not right. They don't know they're wrong looking backwards, but they know based upon their own assumptions that the board is now considering those to be wrong. They've changed because they now have census data, and the census data established that, as objectively, there was not then the type of growth that everyone had been, in quotes, assuming. So that assumption was wrong. Rather than looking at it in that lens, they looked at it in a lens from years before that turned out, under the census data, not to be correct. As such, that substantive irregularity caused, I guess we have to surmise, because once again the door was closed, the board to reverse itself. We don't know why. When we look at all of these essentially together, the procedural irregularities, the substantive irregularities, and what Mr. Hecht will talk about, the refusal of the board repeatedly, although asked, to articulate why it changed its mind, that is why this is a case that really cries out for greater scrutiny. In addition, when we look at it just as a pure administrative review matter, I'd submit to the court that it's also clearly erroneous under that standard. Ultimately, what was approved was approved despite a record that established a state agency report, the professionals for the board, identifying specific, if you will, criteria that weren't met. A supplemental state agency report that identified similar sorts of criteria. And it's important to look at what criteria weren't met. These aren't criteria that we could say are the ones on the side, or the hope, who cares, or the non-important ones. These are criteria that go specifically to the heart of that act. Our legislator looked at this act and said, we need to have a planning act that looks so we have proper distribution and proper, if you will, balancing of supply and demand. And that's what they missed out on. Will the market take care of supply and demand businesses? I mean, what is the evil to be corrected here? The citizens up in McHenry County are going to get a shiny new hospital built by a company who has proven a record of running nice hospitals. And so is the public going to suffer? Yes. The reason the public will suffer here is when we look at the other hospitals in and around this particular planning area, those hospitals, which are also providing levels of service and supporting the community, are operating at less than the target level that the state board has established. Because of that, we will start taking from those hospitals more and more people. There's only, fortunately or unfortunately, so many people to go around. And that's why the planning act looked to and the board should look to balancing that so we do not have a maldistribution or a hospital where there is not a need. And that's how the public is hurt because now we have other hospitals that can't perform, for lack of a better word, enough service because their occupancy is so low. When we look at population growth, are they also looking at the demographics in terms of age, in terms of that population? In other words, we know we have an aging, baby-booming population that is creating greater demand for medical services. Do they look at that finely when they look at that? The answer is yes and no. In terms of the actual growth of the number of population, not so much. In terms of the demand for particular services, the answer would be yes. I think this is best summed up by a quote that comes out of the record at C14124, 14,124. And the quote says, quote, the proceedings before the state board will be irrevocably tainted by the unauthorized action and any decision rendered by the board would be void. The decision contravenes the procedure set forth in the planning act and would be invalid. That wasn't said by Advocate. That wasn't said by Mercy. That wasn't said by Sherman. That was said by Sintegra. And I think that's prophetic. And that's what actually happened here. They ended up, this board, with a procedure that was procedurally tainted, substantively tainted. I submit it gives us the impression that it's the old board that operated behind closed doors and in all respects was inappropriate. And that is why it would be appropriate for this court to reverse what this particular board did. That says nothing. I have a question about the procedure. The hearing prior to the final vote, there were three speakers, as I recall. Yes. But none from the two hospitals, three hospitals, I guess, that you represent. Were you allowed to speak? You were invited to speak. Well, invited to speak is a very strong word. I don't think anyone is really invited to speak. Probably the preference is that no one stands up. There was an ability to give, we thought, written comment. There was certain oral comment that was given, but that was the extent of it. It was very limited. And that's what's so odd here is that this board typically operates under a manner of, when there's an open meeting, which there should be, that people get to speak and give their, if you will, opinions to the board. And then the board gets to deliberate in public so they can be heard by the people that are interested. That didn't occur here. None of these deliberations for this reversal, none of the deliberations for the so-called articulation of reasons under Medina that the circuit court required were done in public. And that's really one of the issues here is that this board seems to have reverted to what it was before, before the 2009 Planning Act, and that is improper. And therefore, we urge this court to reverse. And what Mr. Haft is going to respond to is specifically the lack of the articulation of reasons under that Medina decision. Thank you. Mr. Haft, you have six minutes. Thank you. May it please the court, counsel, good morning. My name is Steve Haft. I represent the Appalachian Mercy. As Mr. Morris indicated, I'm going to address two narrow and related issues, both of which lead to the conclusion that the board here acted arbitrarily and capriciously and that its decision should be declared void. The first deals with the fact that the board, after a long process involving public hearings, submission of experts' reports, submission of two staff reports, voted twice to not allow the Sintagra application. And then on limited reconsideration, where it didn't allow written comments, it did not ask for another report from the staff, the board voted to allow the application. Since that time, including that time, there have been four opportunities, at least, where the board could explain why it did a 180-degree change. The board has never addressed that point. Let me ask you, at one point did the board approve an upgrade, if you will, to one of the Appalachian facilities where they were going to add rooms? I think that's not to our facility, Your Honor. It may have been to Appalachian, I'm sorry. Sintagra. Did they have an application that was approved to add on to an existing facility somewhere? I think there was one in Woodstock. And was that approved? It was approved. It was not constructed. And then I think the athlete abandoned it. And so the board approved that. Yes. But then Sintagra rethought it and said, well, instead of putting all this new stuff, we'll pass it to an old stuff. We'll just start all over and build one new hospital. I think the record would show it's not quite that linked. I think that they presented the Huntley Hospital as something they needed regardless, and then they abandoned the Woodstock project at the same time. I think there's an implied linkage. I don't recall if they expressly said we're doing this because. Okay. They abandoned one project that had been approved and at about the same time. I think that's right, Your Honor. That they applied to just build a new facility. Yes. The point is that the Supreme Court in the Greer case and the Illinois Appellate Court for the First District in the Commonwealth Edison case made clear that when an administrative agency does a sudden and abrupt change without explanation, that's the epitome of arbitrary and capricious behavior. Here the board has never explained why it changed its mind. In the briefs you read the lawyers for the board and the lawyers for Syntagra saying, well, there was new evidence, or they may have made a mistake. That's the lawyer's backfilling. The law requires that the board come forward and say, here's why we changed our mind. In their briefs, the appellees say, well, the board can change its mind. It's a red herring. We have never said the board cannot change its mind. If the board has a legitimate reason for changing its mind, and it articulates that reason. The whole, and Mr. Morris alluded to, the whole legislative intent of the amendment of the Act was to bring consistency and transparency and predictability to the board's decision-making process. And we have a board which, on a limited review, with no new staff review and no new evidence, abruptly changes its mind. And then, on four occasions, when it addresses the change, never once explains at all why it changed its mind. That is arbitrary and capricious. And that same standard applies to the board's decision to approve the Syntagra application. Again, the board is required to provide finalist conclusions and some coherent rationale to link the two to explain why it did what it did so a judicial review can go forward. Without reasons, the court reviewing it has to either accept everything the board did and understand the decision or review everything de novo, which is not the rule. That's why findings are critical. If you look at the... Well, let me just add, is it that, is it Mercy's position that there didn't need a new hospital there or that a hospital would be okay as long as the board's procedure was all right? The former, Your Honor. We don't believe a hospital at that location, at that place, was the right place to put a hospital. But the issue we're raising here... Didn't Mercy file an application to put a hospital somewhere pretty close to right there? Yes, and it was denied by the board. But our point here is we're not arguing about the weight of the evidence. We're not arguing about whether it was a good or bad decision in the sense of the merit. It is that the procedure that they were required to follow was not followed and they have simply borne forward and refused to say why they changed their mind. They left it for the lawyers to argue... One minute. Thank you. They left it for the lawyers to argue the reason. It might have been this. It might have been that. It might have been this. You can search the record. You'll never find the board ever saying why they did a 180 on this. One final point with limited time. There's a mentioned idea suggesting there was new evidence presented in July of 2012 when the board voted to allow the application. The evidence the board heard on July 12, in July 2012, was the same evidence as before in July 2011 before it denied the permit. And just to emphasize that point, one of the points they make in their brief is that on July 2012, the consultant from Deloitte, Centegra's expert, said the current Centegra report, the one that had been misfiled, actually supported the application because it used more progressive population growth assumptions than did even Deloitte. Well, that same point was made by Deloitte's consultant in July of 2011. This is the record at C230001. We said the Deloitte projections were more conservative than the growth rates used by the financial consultant for the project's objectives as shown in the Crenn study. So the board ruled in 2011 this idea that the Crenn study used a more aggressive population growth assumption than Deloitte, and it still denied the application. One year later, the same consultant from Deloitte stood before the board and made the same point, and now that's portrayed as new evidence justifying the change of heart. It's not new evidence. And the board never once said it heard new evidence. Let me ask you this. In the board's report, do they have to say, we changed our mind because, or is it sufficient to say, we approve this application because? I mean, in other words, two different texts. If the board just says we approve this application because, is that good enough, or do they have to say we changed our mind because? When you change your mind so dramatically based upon the same evidence, then the act requires that you be transparent, that you be consistent, and that you come forward and say why it is you changed your mind. If it's a new application, you consider it the first time, and you give your reasons, that's fine. And we're not setting a barrier that says you can't be consistent when you've changed your mind. That's right. So, I mean, I don't know where that consistency comes in. Well, because I think... It's impossible. That's a good point, Otter, but I think the consistency is going forward. People who appear before the board, people who draft the applications, then know what it is the board is looking for. So the board can say, yes, we changed our mind, but then they articulate why they changed their mind and what the relevant consideration is. So, in other words, you're saying that there's nothing to prohibit the board from reconsidering the exact evidence and presentation that was there when they took the other view. You're saying there's nothing wrong with that. That's correct. We're not contesting their right to take back on remand from the administrative law judge, have their record corrected, and reconsider that record with that single corruption. We agree with that. And I think I've made clear we don't disagree with their right to change their mind, but we don't know why they changed their mind. And given this board and given the legislative history, that is crucial. And by changing your mind without saying why, that's what the L.A. Supreme Court in Greer said is arbitrary and capricious conduct. Thank you, Your Honors. Thank you, Mr. Wright. Good morning, Your Honors and Counsel. May it please the Court, Assistant Attorney General Linda Boakye-Ansah, on behalf of the Illinois Health Facilities and Services Review Board and its chairman. Your Honor, we would urge this Court to affirm the board's decision for the following reasons. First, it's undisputed that Sintegra's application for a certificate of need satisfied the overwhelming majority of the review criteria set forth in the regulations. It's also undisputed that the regulations authorized the board to issue a permit even if a project fails to meet one or more criteria. Illinois courts have consistently confirmed that the board may approve an application even if it doesn't meet all of the review criteria. For example, in Provena versus the Illinois Health Facilities. Can I direct it to, I think the issue is opposing counsels, why did they change their mind? That's what we're lacking here. Your Honor. I'm not sure, I think first counsel probably, maybe you're addressing more of the first counsel's argument, I'm not sure, but that seems to be at the heart somewhat of this issue of the appropriateness of the board's actions. Your Honor, I'm not actually sure that that is at the heart of this matter. I mean, what the case law looks to is whether or not the board's decision was sufficiently substantiated. And, you know, if you look at, so in terms of between the board's initial vote and the board's subsequent vote to approve the application, at the December 2011 vote there was a 4-4 tie, meaning because they didn't get a majority vote, it was not approved. At the subsequent vote, there was. At the first vote, the first vote was an intent, that's sort of the board's preliminary consideration of the issue, and the statute allows for a reconsideration after that first vote. So really what we're looking at is between the December 2011 vote and the July 2012 vote. And there was a 4-4 tie, meaning not all nine members of the board were present at that December 2011 meeting. By the time of the July 2012 meeting, the full board was there, and the board member who was absent at the first meeting voted in favor of approving the application. So that single vote alone was enough to move the application from being tied to being approved. And if you look at, if you look in terms of the missing criteria, you know, courts have consistently confirmed that the board can approve an application even if it doesn't meet all of those criteria. So in Provena, the applicant was missing seven of 21 review criteria, but the appellate court affirmed the board's decision to grant the permit because it substantially conformed to the review criteria. In this case, where all the parties agreed that only three were missing, there's also substantial compliance and the board's decision should be affirmed for that reason. Again, going back to this issue of, you know, sort of what changed, not that that is determinative of this issue because we don't think it is, or determinative of this case, we don't think it is. But, you know, in addition to the additional board member who was present, there was testimony. If you look through the open, you know, the record, under the Open Meetings Act, various persons were allowed to comment, and there was additional discussion that the board members heard during that time period that could have swayed their vote from, you know, the initial tie to being approved. These were the three speakers that the ZANE were? Your Honor, my recollection is that there were more than three, and my recollection is also that the opposing hospitals were able to comment as well. I don't think there was ever a time where only Centegra was allowed to address the issue. This vote was recorded when there were eight board members. Yes. So now we have the ninth member, and that was a 5-4 decision. It actually was a 6-3 decision. So we actually did have the original eight, some change. Yes. And there were members of the board who commented on the reasons for voting for or against Centegra's application. Not all members did, but nothing in the regulations or in the statute requires each individual member to explain the reasons for their vote. Right, but I think opposing counsel is saying that the board is under some obligation to do so. The board is under an obligation to explain the reason for its ultimate decision, and it certainly did so in this case. The board, in its order, starting on page C14196 of the record, explained that based on the most recent projections that it credited, there was an increasing bed need for medical-surgical intensive care beds as well as intensive care unit beds. The staff review showed that the need increased from 83 to 138 for medical-surgical beds and increased from 8 to 18 beds for intensive care unit beds. The board went on to explain that it did not agree with the staff's finding that the Centegra project wasn't needed and would lead to an unnecessary duplication of services. The board also... Where did this new evidence come out? Where was it found? The evidence was, those were the projections that were in the record. There was between, so between the initial consideration of the project in, I believe, June of 2011, there was an updated projection that was a part of the record before the board. Projected by? I believe it was projected by... I can't recall. It's either the board staff... It might have been the board staff. Yes. But even with that updated projection, the staff still made a recommendation to the board of not approving it. Right. And, you know, the staff is... The board also, in its written decision from 2013, explained that to the extent that the staff found three criteria missing, they decided that the overall benefits of the project would outweigh those three missing criteria. So the opposing hospital's insistence that the board didn't explain its reasons is just contradicted by this evidence. At bottom, Mercy and Advocate are asking for the board to make a recommendation to re-weigh the evidence concerning Santegra's application in their favor. But this court will not reverse the administrative agency's decision unless there's the definite and firm conviction that a mistake has been committed. And we respectfully submit that that standard has not been met in this case. For those reasons and those set forth in our brief, we would ask this court to affirm the board's judgment. Thank you very much. Thank you. Mr. Lawler, you're going to take seven minutes as well. May it please the court, counsel. My name is Dan Lawler. I represent the permit holders, Santegra Health System and Santegra Hospital Huntley. Mercy says in the conclusion of its reply brief that this appeal is not about whether the board can change its mind. Agreed. The Health Facilities Planning Act allows multiple votes on a project. If the legislature did not intend the board to change its decisions, it would not have allowed multiple opportunities for it to do so. Your Honor, asked about what the board has to explain. In the Medina nursing case that the plaintiffs all cite, the court said an agency decision should contain basic findings and ultimate conclusions linked together by a coherent rationale. The board did this in its written decisions. This talk about the board changing its mind, let's look at that. A majority of the board members voting on this project did not change their minds from the initial denial to the final decision approving the project. Five of them voted the same. One board member wasn't at that initial vote. He voted for the project on the final vote. He didn't change his mind. You've got six board members who didn't change their mind. There were three who did. Two who voted against the project the first time around. Voted for the project on the final approval. And what did those board members have before them that they didn't have before? Well, these were two board members who were concerned about the impact on existing facilities. This new report that they had said was so important that was put into the record and the board reconsidered it was addressed to that very issue. We had an expert from Deloitte testify under oath on the reconsideration that their own report used population growth figures that were greater than the figures that Centegra's own experts were using. It justified and vindicated Centegra's projections that this project would not adversely impact existing facilities. That was not before the board before. What they are referring to that was before the board was a footnote on one page of a 10,000 page record. And that's all they had. When they had the reconsideration, voted on the final approval, they had before them the expert sworn testimony explaining the impact of this new report that the board was to reconsider. That was enough and certainly it was a rational basis for those two board members. The new report. So it was a new report. You're talking about a footnote. Now we have live testimony explaining the footnote. Is that what you're saying? Exactly, Your Honor. So that's the new evidence is the testimony. That's right. But the actual data was in the record prior. The point, the fact was in there. But the implications of that fact. Okay, that's what I'm saying. The data was there. The data was there. But now you have under sworn testimony an explanation and interpretation of the data. That's right, Your Honor. That's right. And that's what you're saying is the new evidence. We're saying that and we're also saying that the board has discretion to weigh the evidence. And they don't have to weigh it the same time that every time it comes before the board. So that's another factor. So it could have been the case, you're saying, sufficient that a board member said, Oh, I'm going through 10,000 pages and, aha, I find this footnote. And I looked at it and I studied it and I think that footnote has greater weight than it did as it existed in that document under the prior vote. Certainly, Your Honor. Certainly. So that would be okay. But you're saying you have the data there. But now you have what's additional evidence in your view is an interpretation explanation under sworn testimony as to what that data says. That's right, Your Honor. The person responsible for that footnote was testifying under oath before the board on that reconsideration. And who was that? That was Richard Pekars from Deloitte Financial Services. Was he one of the three speakers at the final hearing? He was one of the speakers for Sintagra. The Sintagra officer. Michael Eesley was there, yes. This fellow and the mayor. Yeah, the administrator of Huntley was there. But not testifying under oath. He was giving a public comment along with a comment from as many of the plaintiffs who wanted to be there. There was no limit on how many signed up and they had multiple sign up. Now, what they're complaining about is, yes, we were able to give oral comments, but the board didn't let us give written comments. Well, first of all, they didn't request that. Second of all, they've never told us what that written comment was going to be. This record is full of their written comments. Most of the times that they came before the board, they just repeated stuff that they had said previously. And so, Your Honor, there's no harm here. And I would like on the written comment to cite the Provena health case, which was Advocates Own Hospital in Elgin, Advocate Sherman. Provena was objecting, complaining they didn't have sufficient procedures made available to them. Provena was given a meaningful opportunity to present its case under the Act and regulations. Provena presented testimony at the public hearing, submitted written materials, sought judicial review of the board's decision. The board took into account the impact on Provena in deciding to grant the permit. To allow a party adversely affected by a permit, greater participation opportunities would risk unnecessarily prolonging and complicating the CON application process. And if I may end with a quote from Justice Alber Wendell Holmes, some rules of law are merely a concession to the shortness of life. We have to end this proceeding at some point. Thank you, Your Honor. Thank you. Mr. Morris. In 2009, when this Act was rewritten, the task force rewriting it said, and I quote, the decisions of this board must be consistent with appropriate standards. And that's what's missing here. It doesn't say consistent with each other. No. But when this went to the circuit court on the initial administrative review, Judge Petrengarl sent it back to the board for an articulation of reasons. The board purportedly articulated those reasons, and then in a subsequent order, the judge said, explain page 10 of your decision board. And page 10 of that decision, which appears in the advocate's appendix at A90, specifically addresses that they changed. It talks about the back and forth and how they changed their mind. And that's what is lacking. Counsel now suggests that there was new evidence. If there was new evidence, and the new evidence somehow made a difference, it wasn't in the public record of any discussion or deliberation, and it surely was not in what specifically the board articulated in its written decision of September 24th as being the reason for changing. This is a case I would submit to the court when we look at it under an applicable standard of review. This court looks at it de novo. Did it follow its rules, and were its rules met? It only looks at it clearly erroneous, as the state board suggests, in terms of its mixed questions. Here, as a matter of law, I would suggest to the court, it did not follow its rules. Let me ask you this question, because this goes to the same thing. When the board issues its ultimate decision after it's sent, do they have to say, now they've decided to approve it? If they explain their reasons, we approved this application because dot, dot, dot, or we changed our mind because. In other words, we not only got to explain why we're doing now, but what we did the last time and why we changed our mind. In this case, they must do the latter. They must do the latter because that's, first of all, what the circuit court judge said they must do, but more importantly, they must do the latter because nothing changed except for their mind. There's no new state agency report. There's no supplemental report. There's no discussion. So for purposes of review, this court and any court looks at what the board does and says, I don't know why they did what they did, and that's why here it's important for them to have explained why they did what they did, which is a 180 or a reversal based upon this limited remand, based on this limited evidence. They heard testimony on remand, right? Limited, yes. And I thought it's kind of like oral argument, right, in the sense that, okay, the material's already there. We've already got these briefs, but you folks come in here and thought, maybe if we get a chance to talk to these people who don't know what we're doing, we can maybe explain it so they will understand it. And isn't that what happened on remand? No, and that's the difference. When this court hears oral argument, it has the briefs. Here, when this board heard it, we'll say on remand, it wouldn't allow written comment. It didn't have the briefs. So because of that, then being complicated by the fact that it didn't deliberate in public, the court doesn't deliberate in public, but public agencies and boards do. They don't deliberate in their offices or in their chambers or behind a closed door, and that's what's lacking here, and that's why this board, I submit, was obligated under Medina, was obligated under the circuit court's decision, and was obligated based upon what they said they were doing to explain why they did what they did. And having failed to do that, they simply missed what this act requires, which is consistency, openness, transparency, none of which was here. We would urge this court, therefore, to reverse the board's decision and, therefore, vacate the permit. Thank you. Thank you. In my opening remarks, I said the board has had four opportunities to explain why it changed its vote, and it did not. I changed it. It's been five opportunities. You asked, why did the board change its vote? There is no answer to that in this record. Counsel for the board said it could have been something. It could have been anything. That is the vice of this. It could have been a lot of things. We don't know what changed their mind. What was the vote when they denied it? It was 4-4 in December of 2011. And that got to be a deny? Yes, you have to have five votes to approve. And then when they approved it, what was the vote? Six to three. Okay. But at least five to four, right? So just that alone would explain, one more voter would explain what changed, wouldn't it? It could. But that's not what happened. Other people changed their vote from yes to no or no to yes. So it wasn't just this person's appearance that changed the vote. Something else happened. And we don't know what that was. And no one has explained it yet. Let me address one point on this new evidence point that's come up. I don't know where this reference to a footnote comes from. But if the court, I know you won't look at it now, but at the hearing in July 2012, Mr. Pekars appeared, and he spoke. And at C-2844, Mr. Pekars says, let me explain. The new report claims we overstayed population growth. This is false. And then he goes on to say, well, Krentz claims that we overstayed the projected population growth. We actually used a lower growth rate in preparing our proforma than Krentz did. So that's the point he made when he was appearing live. We used a lower proforma than did the Krentz report. C-2300 to 2302 is the report that Mr. Pekars submitted a year earlier in which he said, By comparison, the Krentz study used an annual growth of 2.3. Consequently, our analysis used a growth rate substantially lower than the objectors. Our growth estimates estimate the overall compound growth for the marker at 1.6 percent, much lower than the percent used in the Krentz study. It wasn't that he appeared and said anything new. He appeared and regurgitated the same thing. The only thing I heard now is that because he was under oath in July 2012, that should have more weight than the letter he submitted. Well, that's a rather slippery slope if you can walk away from what your expert submits because you now say, You came under oath when you submitted this report. He said the same thing here that he said before. There was no new evidence and the board didn't cite it. So we go back to your question. Why did the board change its mind? All we know is that it did and the evidence was the same. And that is arbitrary and capricious conduct. And the remedy has to be the board's decision is void. So I'm clear on this. When he is giving his sworn testimony, which you are responding to. Yes. Did you have the opportunity to have someone there to point this out, what you're just saying, or respond to this? Yes, we had the opportunity. But there was nothing to point out because it had been said before. This was just regurgitating what he had told the board a year before. It was nothing new. So there was nothing new to rebut. It was just, as you said, oral argument, people repeating what they said before. Well, if no one else changed their vote, but the ninth voter voted, was his vote to approve? Yes. So if the ninth voter voted, that would have rendered an approval. That would have rendered an approval. And if nobody else changed their mind. That's right. So doesn't that take the reversal out of the arbitrary and capricious category? No, because that's not what happened here. I know what the point you're making, but something else went on here because people changed their votes. So there was something more than just one person showing up who had not been there before and that person casting a vote. The net result is it didn't matter. If everybody else had kept their votes the same, this person comes in and votes to approve, voila, approved. It matters because that's not what happened, Your Honor. I understand the point you're making, but it seemed to me that there was a dynamic. Something went on somewhere where people's votes changed for some reason we haven't been told about. Under your thing, though, every member of that board would have to explain why he or she changed their vote. Well, the board would explain why it changed its vote. The board would come together with an explanation, which is the board's explanation, not each individual's explanation, and say the board has concluded this as opposed to what it prior concluded, which was that. I mean, we review the board's actions. We don't review individual members' actions. Well, if that's the case, then what's the difference? If anybody of those first eight changed their votes, if we agreed that the ninth vote would have rendered an approval and a changed decision? Because I can only say something happened where people changed their votes based upon something we don't know what happened. Well, let's talk about that changed vote. Yes, sir. Who changed the vote from no to yes? I can't remember the names. Okay, but there was a change from no to yes. There were two changes. There was two changes from no to yes and one change from yes to no. But I don't remember the names. Justice Schmidt, did I answer you? You did. Thank you very much. Thank you for your time and attention. We appreciate it. Thank you. Thank you all for your arguments today. It's a very interesting matter. And we'll take this under advisement and get back to you with a written disposition. Thank you. We'll be on a short break. We'll now take a short recess and we'll be on a short break.